UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:13-CV-1150-CHL

GERRY A. HELM,                                                        Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,                          Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the complaint of Plaintiff Gerry Lee Helm filed on November 18, 2013. (DN 1.) In her complaint, Helm seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") pursuant to 42 U.S.C. § 405(g) (2012) ("Any individual, after any final decision of the Commissioner of Social Security[,] . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . ."). Helm filed a Fact and Law Summary on July 14, 2014. (DN 10.) The Commissioner filed a Fact and Law Summary on August 14, 2014. (DN 11.) The parties have consented to the jurisdiction of a magistrate judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed. (*See* DN 9.) Thus, this matter is ripe for review. For the reasons set forth below, the Court affirms the final decision of the Commissioner.

I.      BACKGROUND

Helm filed an application for a period of disability and disability insurance benefits on September 12, 2007. (R. 205-07.) Helm alleged that she became disabled on October 1, 2006 as a result of back injury that occurred at work. (*Id*. at 177.) The Commissioner denied her

1

application for disability insurance benefits initially and on reconsideration.  A hearing was held by Administrative Law Judge Patrick B. Kimberlin III ("the ALJ") on August 7, 2009, after which an unfavorable decision was rendered on September 14, 2009.  (R. 116, 175-83.)  Helm appealed that decision to the Appeals Council who then remanded the case back to the ALJ in light of what it deemed new and material evidence.  This new and material evidence consisted of treatment records from treating physician, Dr. Rinkoo Aggarwal.  (*Id*. at 186-87.)  The Appeals Council also directed the ALJ to obtain evidence from a consultative medical expert.  (*Id*. at 187.)  Following the remand, the ALJ conducted two more hearings.  The first hearing was held on September 19, 2011 to discuss the completeness of the record; no testimony was taken.  (*Id*. at 66.)  The second hearing was conducted on May 10, 2012.  (*Id*. at 29.)  At the hearing on May 10, 2012, Helm was present and represented by counsel Larry Ashlock.  (*Id*. at 31.)  Dr. Arthur Lorber, a consultative medical expert, appeared by telephone.  (*Id*.)  Robert Piper, a vocational expert, also testified at the hearing.  (*Id*.)

In a decision dated June 11, 2012, the ALJ engaged in the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled[1] and, in doing so, made the following findings:

1. Helm meets the insured status requirements of Sections 216(i) and 223(d) of the Social Security Act, Pub. L. No. 74-271, 49 Stat. 620 (codified as amended at 42 U.S.C. §§ 416(i) and 443 (2012)) through December 31, 2011.  (*Id*. at 21.)

2. It was previously found that the Helm is the unmarried widow of a deceased insured worker and has attained the age of 50; therefore, Helm met the non-disability

---

[1] The ALJ also considered the additional issue of whether Helm is entitled to widow's insurance benefits under Section 202 of the Social Security Act, Pub. L. No. 74-271, 49 Stat. 620 (codified as amended at 42 U.S.C. § 402(e) (2012)).  (R. 19.)  Specifically, the ALJ examined whether Helm is the widow of a deceased insured worker, has attained the age of 50, is unmarried, and has a disability that began before the end of the prescribed period.  (*Id*.)  As noted below, the only issue with respect to widow's insurance benefits is whether Helm was under a disability on or before March 31, 2016, the end of the prescribed period for widow's insurance benefits.  (*Id*.)  Helm does not take issue with the ALJ's finding in this regard other than the conclusion that she is not disabled.

requirements for disabled widow's benefits as set forth in Section 202(e) of the Social Security Act.  (*Id.*)

3.  The prescribed period for widow's insurance benefits ends on March 31, 2016.  (*Id.*)

4.  Helm has not engaged in substantial gainful activity since October 1, 2006, the alleged onset date.  (*Id.*)

5.  Helm has the following severe impairments:  lumbar degenerative disc disease and status post microdiscectomy with residuals and obesity.  (*Id.*)

6.  Helm does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 22.)

7.  Helm has the residual functioning capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) with these limitations:  she can occasionally lift 20 lbs. and frequently lift 10 lbs.; can occasionally bend, stoop, crouch, and kneel; cannot crawl, work at unprotected heights, balance, or climb ropes/ladders/scaffolds; must avoid concentrated exposure to vibration; may occasionally use foot pedals with either foot; can occasionally climb ramps or stairs; can stand and/or walk for a total of four hours per day and sit up to eight hours per day, but no more than one hour at a time, and at the completion of sitting for one hour may stand/walk at the work station for a couple of minutes before returning to her seat; and must avoid extreme temperatures.  (*Id.* at 23.)

8.  Helm is unable to perform any past relevant work.  (*Id.* at 25.)

9.  Helm was born on April 2, 1956 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. Helm subsequently changed age category to advanced age.  (*Id.*)

10. Helm has at least a high school education and is able to communicate in English. (*Id.*)

11. Helm has acquired work skills from past relevant work.  (*Id.*)

12. Considering Helm's age, education, work experience, and RFC, she has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.  (*Id.* at 25-26.)

Helm timely requested an appeal to the Appeals Council on July 26, 2012, seeking review of the ALJ's decision.  (*Id.* at 12-14.)  The Appeals Council denied Helm's request for

review on September 17, 2013.  (*Id*. at 1-3.)  At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 422.210(a); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Helm filed this action on November 18, 2013.  (DN 1.)

## II.    DISCUSSION

The Social Security Act authorizes payment of disability insurance benefits to persons with disabilities.  Social Security Act, Disability Insurance Benefits, 42 U.S.C. §§ 401-34 (2012).  To establish entitlement to disability insurance benefits, a plaintiff must establish that she became "disabled" prior to the expiration of her insured status.  42 U.S.C. § 423(a), (c); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).  Therefore, Helm must show that she became disabled on or before December 31, 2011, the date that she was last insured.[2]  An individual shall be considered "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a) (2014).

### A.    Standard of Review

In conducting its review, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Sec'y of Health and Human Servs.*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson,* 471 F.2d 1265 (6th Cir.1972)).  Rather,

---

[2] Under 42 U.S.C. § 423(a), an individual is entitled to disability insurance benefit payments if she "(1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528-29 (6th Cir. 1997).  The Commissioner does not dispute that (1)-(3) are met.  Therefore, the only question is whether Helm was under a disability.

the Court's review is limited to determining whether the findings set forth in the final decision of the Commissioner are supported by "substantial evidence" and the correct legal standards were applied. 42 U.S.C. § 405(g); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  If the answer is "yes," then the Court may not even inquire as to whether the record could support a decision the other way.  *Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989).  "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion . . . . " *Id.* at 108; *see also Cotton v. Sec'y of Health and Human Servs.*, 2 F.3d 692, 695 (6th Cir. 1993) (internal citation and quotation marks omitted).  Therefore, "[a] reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart*, 710 F.3d at 374.

### B.     Five-Step Sequential Evaluation Process

The Social Security Administration has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating a disability claim.  20 C.F.R. §§ 404.1520, 416.920.  In summary, the evaluation proceeds as follows:

1)     Is the claimant engaged in substantial gainful activity?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," proceed to the next step.

2)     Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement and significantly limits his or her ability to perform basic work activities?  If the answer is "no," the claimant is not disabled.  If the answer is "yes," proceed to the next step.

3)     Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within Appendix 1 to Subpart P of Part 404 of this chapter? If the

5

answer is "yes," the claimant is disabled.  If the answer is "no," proceed to the next step.

4)    Does the claimant have the RFC to return to his or her past relevant work?  If the answer is "yes," then the claimant is not disabled.  If the answer is "no," proceed to the next step.

5)    Even if the claimant cannot perform past relevant work, does the claimant's RFC, age, education, and past work experience allow him or her to perform a significant number of jobs in the national economy?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," the claimant is disabled.

*Id.*

The claimant bears the burden of proof with respect to the first four steps.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422-23 (6th Cir. 2008).  The burden shifts to the Commissioner at the fifth step to prove that there are available jobs in the national economy that the claimant is capable of performing.  *Id.* at 423.  However, the claimant always retains the burden of proving lack of RFC.  *Herr v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

C.    **Helm's Allegations**

Here, Helm's claim was denied at the fifth step of the sequential evaluation process.  Helm takes issue with two of the ALJ's findings in coming to that conclusion:  Finding No. 7 and Finding No. 12.  With respect to Finding No. 7, Helm argues that the ALJ failed to give the opinions from her treating physicians controlling weight.  With respect to Finding No. 12, Helm contends that the ALJ wrongly discounted her age as a limiting factor in her ability to adjust to other work.  The Court will address each of Helm's arguments in turn.

6

### 1.      Finding No. 7

At the first part of step four of the sequential evaluation process – determination of RFC – the ALJ made Finding No. 7.  In Finding No. 7, the ALJ found that Helm has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) under these conditions:  she can occasionally lift 20 lbs. and frequently lift 10 lbs.; can occasionally bend, stoop, crouch, and kneel; cannot crawl, work at unprotected heights, balance, or climb ropes/ladders/scaffolds; must avoid concentrated exposure to vibration; may occasionally use foot pedals with either foot; can occasionally climb ramps or stairs; can stand and/or walk for a total of four hours per day and sit up to eight hours per day, but no more than one hour at a time, and at the completion of sitting for one hour may stand/walk at the work station for a couple of minutes before returning to her seat; and must avoid extreme temperatures.  (R. 23 [finding no. 7].)

### a.      Applicable law

The RFC finding is the ALJ's determination of what a claimant can still do in a work setting despite his or her physical and mental limitations.  20 C.F.R. §§ 404.1545(a), 404.1546. The RFC finding is based on a consideration of medical source statements and all other evidence, medical and non-medical, in the record about what a claimant can do despite limitations caused by his or her physical and mental impairments.  20 C.F.R. §§ 404.1529, 404.1545(a), 404.1546; Social Security Ruling 96-7p, 1996 WL 374186, at *1 (July 2, 1996); Social Security Ruling 96-5p, 1996 WL 374183, at *4-5 (July 2, 1996).  "Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis."

7

Social Security Ruling 96-5p, 1996 WL 374183, at *4 (July 2, 1996).  Thus, in making the RFC finding, the ALJ must necessarily (1) assign weight to the medical source statements in the record; and (2) consider the descriptions and observations of the claimant's limitations as a result of the impairments from the claimant and the claimant's family and friends.  20 C.F.R. § 404.1545(a)(3).  That being said, while opinions from treating, examining, and non-examining medical sources must be considered in determining RFC, the ALJ is ultimately responsible for the RFC finding.  20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183, at *2.  Here, Helm takes issue with the ALJ's assignment of weight to the medical source statements in the record, in particular the opinions from treating physicians Dr. Rinkoo Aggarwal and Dr. Thomas Becherer.

The source of a medical opinion dictates the process by which the ALJ gives it weight. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d  365, 376 (6th Cir. 2013).  Under 20 C.F.R. § 404.1527(c)(2), treating sources must be given controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).  If the treating source is not given controlling weight, then the "opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Id.*  (citing 20 C.F.R. § 404.1527(c)(2)-(6)).  Opinions from examining and non-examining medical sources are assessed under these same guidelines (*i.e.*, examining relationship, area of specialty, consistency, and supportability) and are never assessed for controlling weight. *Id.*  Finally, while opinions from

8

treating, examining, and non-examining medical sources must be considered in determining RFC, the ALJ, not any medical source, is ultimately responsible for the RFC finding.  20 C.F.R. § 404.1527(e); SSR 96-5p, 1996 WL 374183, at *2.

### b.    Relevant medical opinions and evidence

A review of the evidence considered by the ALJ with respect to Helm's lumbar degenerative disc disease impairment – the impairment at issue – is helpful to the analysis.  Helm was working as a registered nurse on September 13, 2006 when she injured her back while helping a patient.  (R. 277.)  An x-ray taken of Helm's lumbar spine on October 12, 2006 showed mild degenerative changes with no significant abnormalities.  (*Id*. at 278.)  A lumbar MRI taken in November 2006 showed degenerative disc bulges at L3-4 and L4-5, resulting in neural foraminal narrowing on the left at L3-4 and on the right at L4-5 with a disc fragment appearing to compress the nerve root at L4-5.  (*Id*. at 280.)   In December 2006, treating neurosurgeon Dr. Thomas Becherer performed a L4-5 lumbar microdiscectomy, and Helm was thereafter referred to physical therapy.  (*Id*. at 292, 299.)  On February 1, 2007, Dr. Becherer saw Helm and recommended that another lumbar MRI be performed.  (*Id*. at 285.)   Pursuant to that recommendation, a lumbar MRI was performed in February 2007, which showed post-surgical fibrosis at the L4-5 nerve root without any definitive nerve displacement and no evidence of recurrent disc herniation at L4-5.  (*Id*. at 302-03.)  Following the February 2007 lumbar MRI, Helm again visited Dr. Becherer on February 15, 2007, complaining of back and right leg pain. (*Id*. at 284.)  Dr. Becherer went over the results of the most recent lumbar MRI with Helm, noting that there was no evidence of residual disc herniation and that the decompression had been successful, although with a less than desired clinical result; he also stated that she should

9

avoid further surgery.  (*Id*.)  Dr. Becherer also noted that Helm continued to suffer from neuropathic pain and prescribed Elavil.  (*Id*.)  Helm was then referred to Dr. Aggarwal, a pain management and rehabilitation specialist, in March 2007.  (*Id*. at 290, 315-318.)  Dr. Aggarwal stated that Helm was ready to return to work and advised that she lift no more than twenty pounds, avoid repeated bending and stooping, no twisting, and to sit and stand as tolerated.  (*Id*. at 318.)  Dr. Aggarwal also prescribed Helm Neurotonin and Darvocet.  (*Id*.)

On May 17, 2007, Helm was seen by Dr. Becherer again:  she had a negative straight leg test, normal motor exam, diminished ankle reflexes bilaterally, and there were no other signs of *cauda equina* syndrome.  (*Id*. at 283.)  Dr. Becherer again recommended that no surgery be performed and that Helm continue with pain management.  (*Id*.)  Helm saw Dr. Aggarwal again in July 2007 where, although Helm complained of continued pain, reported improvement with opiate pain medication and muscle relaxants; Dr. Aggarwal reported that physical therapy was ineffective.  (*Id*. at 321.)  Dr. Aggarwal stated that Helm should continue restrictions as stated previously.  (*Id*. at 323.)

On August 17, 2007, another lumbar MRI showed a possible recurrent disc protrusion or extrusion at L4-5, resulting in moderate to marked encroachment and surrounded by epidural fibrosis.  Helm saw Dr. Aggarwal on August 23, 2007 where she reported that pain medication had been effective.  (*Id*. at 324.)  Dr. Aggarwal noted that the lumbar MRI performed earlier in the month revealed possible recurrent disc herniation at L4-5 and noted that surgery may be warranted.  (*Id*. at 326.)  Dr. Aggarwal continued to see Helm through at least August 2009, noting that the pain medication was effective, but that physical therapy was not; however, there

is nothing in the record to indicate any effort on Helm's part to actually engage in physical therapy. (*See id*. at 329-31, 379-407.)

On August 27, 2007, an independent medical evaluation was performed by examining physician Dr. Robert Sexton, a neurosurgeon and pain management specialist. (*Id*. at 309.) Helm complained of pain in her low back, right buttock, and around the anteromedial right thigh to the knee. (*Id*. at 312.) Dr. Sexton noted that, since the microdiscectomy, Helm felt that she had improved about fifty percent. (*Id*.) Dr. Sexton also noted that Helm limped on the right leg and got up in a cogwheel fashion. (*Id*. at 313.) Dr. Sexton observed that Helm also had right sciatic notch tenderness, reduced range of motion with flexion, extension, and lateroflexion, and a positive straight leg test at ten degrees right. (*Id*.) Helm's neurological exam was essentially normal. (*Id*.) Dr. Sexton opined that, from the isolated perspective of her back condition, Helm could return to work; however, because of her long absence, he recommended temporary restrictions for four weeks, including no lifting over 30 pounds, no repetitive bending or stooping, and no prolonged sitting in one position. (*Id*. at 310.) However, Dr. Sexton opined that Helm could not return to her past relevant work as a registered nurse due to severe hypertension and morbid obesity. (*Id*.) Dr. Sexton indicated that no additional treatment for Helm's back was reasonable or necessary. (*Id*.) Dr. Sexton interpreted the August 2007 lumbar MRI, specifically the residual abnormality at L4-5, as a common post-operative finding, stating that a microdiscectomy only relieves anatomical decompression and does not replace the entire degenerative disc and that all surgery is followed by a degree of spinal fibrosis. (*Id*. at 311.) Dr. Sexton assessed Helm with five-percent disability and also noted that Helm exhibits signs of symptom magnification, including marked limitation of motion without any evidence of muscle

11

spasm or myofibrosis, pain distribution suggestive of a L3-4 radicular syndrome while the herniated disc was at L4-5, and inconsistent efforts at physical therapy.  (*Id*.)

On October 4, 2007, Helm was seen again by Dr. Becherer.  (*Id*. at 328.)  Helm complained of worsening back pain, as well as hip and leg pain.  (*Id*.)  Dr. Becherer stated that the August 2007 lumbar MRI indicated recurrent disc herniation and recommended decompressing the nerve root and lumbar fusion.  (*Id*.)  Dr. Becherer noted Helm's displeasure with Dr. Sexton's evaluation.  (*Id*.)

On January 29, 2008, Dr. Becherer submitted a statement in response to a request by her workman's compensation carrier to review old records related to Helm.  (*Id*. at 349.)  Dr. Becherer again opined that Helm's back condition had not been stabilized by the initial surgery, and that he advised lumbar fusion and decompression.  (*Id*. at 350.)  Dr. Becherer also indicated that, while a physical assessment should be done by a physical medicine rehabilitation specialist, it was unlikely that Helm would be able to lift over five pounds and should avoid repetitive bending and twisting.  (*Id*. at 351.)  Dr. Becherer also opined that Helm would likely not be able to perform past relevant work as a floor nurse, but could probably do other nursing-type jobs.  (*Id*. at 350-51.)

Dr. Becherer saw Helm again on June 11, 2008 and discussed the lumbar fusion and decompression option again.  (*Id*. at 357.)     Dr. Becherer noted that the request for surgery was initially denied by the workman's compensation carrier.  (*Id*.)  Dr. Becherer noted that Helm had been referred to Dr. Timothy Krise who concurred with Dr. Becherer's evaluation of the situation, *i.e*. would recommend surgery if a myelogram showed that the L5 nerve root was still compressed.  (*Id*.)  Dr. Becherer also noted that, if the CT myelogram did not reveal nerve root

compression, surgery would not likely be beneficial.  (*Id.*)   Dr. Becherer also noted that Helm's blood pressure had been controlled for some time. (*Id*. at 358.)

On June 18, 2008, a CT myelogram scan of Helm's lumbar spine was performed and did not reveal any residual or recurrent nerve root compression.  (*Id*. at 414.)   On June 24, 2008, in light of the results of the CT myelogram scan, Dr. Becherer retracted his recommendation that surgery be performed.  (*Id*. at 359.)  Dr. Becherer assessed Helm with a 13-percent impairment rate given the issues with recovery and failure to resume normal activity.  (*Id*. at 360.)  Dr. Becherer also indicated that Helm may qualify for a chronic pain modifier, but that he would defer to Dr. Aggarwal on that issue.  (*Id*.)

In March, May, and August 2009, Dr. Aggarwal's notes state that an "MRI of the lumbar spine revealed possible disc herniation at L45 level."  (*Id*. at 396, 400, 404.)  It appears that this is a note that was simply continued from visit to visit, starting in August 2007.  (*See id*. 324, 329, 379, 383, 386, 389, 392 [repeating note at August/October 2007 and January/March/June/September/December 2008 visits].)  On September 30, 2009, Dr. Aggarwal prescribed a quad cane for Helm.  (*Id.* at 422.)  Furthermore, on October 1, 2009, Dr. Aggarwal performed a RFC assessment, opining that Helm could occasionally/frequently carry 10 pounds or less, and that she could stand/walk a maximum of 30 minutes at a time and sit for a maximum of 40 minutes.  (*Id*. at 423.)  Dr. Aggarwal also noted the necessity of a handheld assistive device, a quad cane, for ambulation.  (*Id*.)  Dr. Aggarwal further opined that Helm could only push/pull in her lower extremities, that she could occasionally climb ramps/stairs/ladders/ropes/scaffolds, but that she could never crouch, crawl, or stoop.  (*Id*.)  In

sum, Dr. Aggarwal's assessment showed that Helm was not even capable of sedentary work. (*See id*. at 186.)

Dr. Arthur Lorber, an orthopedic surgeon and consultative medical expert, reviewed the medical evidence and testified as a medical expert at the hearing held on May 10, 2012.  (*Id*. at 31-47.)  Dr. Lorber opined that Helm could perform a limited range of light work, specifically that she could occasionally lift 20 pounds and frequently lift 10; occasionally bend/stoop/crouch/kneel and operate foot pedals;  should not crawl, balance, work at unprotected heights, climb ladders/scaffolds/ropes, or have exposure to concentrated vibrations or extreme temperatures; and may climb stairs/ramps.  (*Id*. at 41-42.)  Additionally, Dr. Lorber opined that Helm could walk/stand up to a total of four hours in an eight-hour work day and that she could sit eight hours a day, no more than one hour at a time.  (*Id*. at 42.)  Dr. Lorber found that Helm had been disabled due to her back condition for a time following her work-related injury, but not for a continuous 12 months.  (*Id*.)  Dr. Lorber disagreed with Dr. Becherer's January 2008 assessment of Helm's physical abilities (*i.e.*, that Helm should not lift more than five pounds), stating that it was a "severe restriction" not supported by the evidence in the record.  (*Id*.) Finally, Dr. Lorber questioned the necessity of the quad cane as there was no evidence of focal neurologic deficits in Helm's lower extremities.   Dr. Lorber pointed out that, while Helm reported weakness in her legs, Dr. Aggarwal did not describe a weakness of specific muscles or any atrophy in her lower extremities, and that these findings would be necessary to support an opinion that Helm's falls are caused by weakness in her lower extremities.  (*Id*. at 44-45.)

The Court recognizes that another lumbar MRI was performed on April 3, 2013, *after* the ALJ rendered his decision on June 11, 2012.  (*Id*. at 428-29.)  It is unclear whether the Appeals

Council considered this MRI in considering Helm's appeal the second time.  Even if the Appeals Council had considered the April 2013 MRI, the Court "cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  The Court can, however, "remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding."  *Id.* at 148.  New evidence is material if there is a reasonable probability that it would have changed the outcome of the prior proceeding.  *Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988) (*per curiam*).  New evidence which reflects a claimant's aggravated or deteriorating condition is not material and does not warrant a remand.  *Id.* at 712; *Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) (finding that new evidence that may have revealed deteriorating condition was not material because it did not reveal information about claimant's ability to perform light work).

The April 2013 lumbar MRI was compared to the August 2007 lumbar MRI.  (*Id.*)  The April 2013 lumbar MRI showed interval worsening of the disc bulge at L3-4 with moderate spinal stenosis, in addition to low signal intensity tissue at L4-5 which could be due to recurrent disc herniation or post-surgical scarring.  (*Id.* at 429.)  Without intravenous contrast, which Helm could not tolerate at the time of the April 2013 MRI, the distinction between recurrent disc herniation and scar tissue, however, could not be made.  (*Id.*)  Thus, at the very most, Helm's lumbar MRI demonstrates that her condition *may* be deteriorating and more information is needed to make that determination.  Consequently, the Court declines to remand this case for further administrative proceedings in light of the April 2013 lumbar MRI, which was submitted

15

after the ALJ's decision was rendered.  *See Sizemore*, 865 F.2d at 712 (finding that remand was not proper where proffered medical evidence simply shows deteriorating condition because it does not show the point in time when the alleged disability began).

c.   <b>Weight assigned to the medical opinions by the ALJ</b>

In making the RFC finding, the ALJ assigned weight to these medical opinions.   The ALJ assigned the greatest weight to the opinions of Dr. Lorber with respect to Helm's limitations.  (*Id*. at 24.)  The ALJ noted that, although Dr. Lorber assessed limitations that are to some degree greater than those in the ALJ's prior decision and those assessed by the state agency reviewing physicians, Dr. Lorber had the opportunity to review all of Helm's medical records and to question her at the May 10, 2012 hearing.  (*Id*.)  The ALJ further noted that, unlike Dr. Aggarwal, Dr. Lorber is an orthopedist and his opinions were more consistent with the conservative treatment history, inconsistent exam findings, and the objective medical evidence in the record.  (*Id*. at 25.)  The ALJ assigned little weight to the opinions of treating physician Dr. Aggarwal with respect to Helm's limitations.  (*Id*. at 24-25.)   The ALJ did so because he found those opinions were not consistent with numerous other treating source medical opinions and were inconsistent with Dr. Aggarwal's own prior assessment in March 2007, which essentially allowed Helm to return to a restricted range of light work.  (*Id*. at 25.)  While the ALJ appears to have given controlling weight to the opinions of treating physician Dr. Becherer, he did give little weight to Dr. Becherer's statement that Helm should not lift any more than five pounds and should avoid repetitive bending and twisting; the ALJ did so because at the time this limitation was rendered, Dr. Becherer believed that Helm might have nerve root compression, which was later shown to not be the case.  (*Id*.)  Finally, the ALJ assessed the opinions of state agency

16

examiner, Dr. Olaguoke Akinwande, with respect to Helm's limitations.  Dr. Akinwande opined

that Helm was capable of a limited range of light work, including standing/walking for up to

eight hours a day with lifting limited to 10 pounds.  Nonetheless, the ALJ assigned greater

weight to Dr. Lorber's opinions for the reasons noted, with the exception of Dr. Akinwande's

opinion that supported Dr. Lober's opinion that Helm's cane is not medically necessary.  (*Id*.)

### d.    Helm's arguments

Helm argues that the ALJ erred in discounting the opinions of Dr. Aggarwal and Dr.

Becherer.  Specifically, Helm argues that the ALJ improperly ignored Dr. Aggarwal's opinion

that Helm was not even capable of sedentary work and that he supported this opinion with

diagnostic evidence showing a recurring disc herniation at L4-5.  (DN 10-1, p. 3.)  Helm argues

that Dr. Aggarwal concluded that this MRI was significant for spinal stenosis and that

scarring/fibroids around the surgical site at L4-5 was causing pressure to the nerve root.  (*Id*.)

Finally, Helm notes that Dr. Aggarwal prescribed a quad cane in September 2009.  (*Id*.)  With

respect to Dr. Becherer, Helm argues that the restrictions imposed by Dr. Becherer in January

2008, specifically no lifting greater than five pounds and avoidance of repetitive bending and

twisting, have never been changed even though he was fully aware of Helm's latest diagnostic

reports.  (*Id*.)  Because Dr. Aggarwal and Dr. Becherer were Helm's treating physicians, Helm

argues that their opinions should have been given greater weight than the opinions of Dr. Lorber.

(*Id*.)

### e.    Analysis

As the Court has noted, an opinion from a treating source must be given controlling

weight when it is well supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  Stated another way, controlling weight may not be given to a treating source's medical opinion if it is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record.  Social Security Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  Whatever weight the ALJ accords a treating source's opinion, it must set forth "good reasons" for doing so.  SSR 96-2p, 1996 WL 374188, at *5; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Although never assessed for controlling weight, opinions from examining and non-examining medical sources are assessed based on examining relationship, area of specialty, consistency, and supportability.  20 C.F.R. § 1527(c).

### i.      Dr. Aggarwal

Here, the ALJ gave good reasons for giving little weight to Dr. Aggarwal's opinions.  For one, the limitations assessed by Dr. Aggarwal do not appear to be consistent with the medical evidence in the record.  Dr. Aggarwal repeatedly noted that there is a possible recurrent disc herniation at L4-5.  This appears to be a note that was entered in August 2007 and continued from visit to visit until as late as May 2009.  (*See* R. at 324, 329, 379, 383, 386, 389, 392, 396, 400, 404.)  Furthermore, while this was a possible interpretation of the lumbar MRI performed on August 17, 2007, a June 18, 2008 CT myelogram scan showed that there was not, in fact, any residual or recurrent nerve root compression.    Additionally, on the RFC assessment dated October 2009, where Dr. Aggarwal assesses Helm with limitations that render her disabled, Dr. Aggarwal states that the spinal stenosis and scarring/fibroids around the surgical site at L4-5 are causing pressure/injury/irritation to the nerve root; however, as noted, the 2008 CT myelogram

18

actually revealed no compression.  (*See id*. at 424.)   Therefore, this finding is not supported by any medical evidence.  *See McKenzie v. Comm'r, of Soc. Sec.*, 215 F.3d 1327, 2000 WL 687680, at *3 (6th Cir. May 19, 2000) (unpublished opinion) ("In light of the objective clinical findings and diagnostic evidence which was more consistent with the overall record evidence, we believe that the ALJ was entitled to accord less weight to the opinion of Plaintiff's treating physician.").  Dr. Becherer also noted that the 2008 CT myelogram revealed patency of the L5 nerve root and also included flexion and extension views with no instability being mentioned.  (*Id*. at 357.)

Moreover, as the ALJ noted, medical treatment since the microdiscectomy has remained conservative and no further surgery is indicated, which indicates the absence of, and is not consistent with, a disabling condition.  *See Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. Oct. 2, 2013) (unpublished opinion) (stating that a "conservative treatment approach suggests the absence of a disabling condition"); *Maloney v. Comm'r of Soc. Sec*., 480 F. App'x 804, 808 (6th Cir. May 15, 2012) (unpublished opinion) (finding that ALJ properly rejected opinion of treating physician because claimant had received conservative treatment for her allegedly disabling mental impairment).  Indeed, it does not appear that Helm has even exhausted the available options in terms of treatment, as Dr. Sexton noted her attempts at physical therapy were inconsistent.

Although this issue was not argued with any particularity by Helm – she simply states, "In September 2009, Dr. Aggarwal prescribed a cane" – the prescription of a quad cane is not consistent with the record evidence or adequately supported by medically acceptable clinical and laboratory diagnostic techniques.  (*See* DN 10-1, p. 3.)  "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held

19

assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)."  Social Security Ruling 96-9p, 1996 WL 374185, at *7 (July 2, 1996).  As Dr. Lorber noted, there is no evidence that Helm has any focal neurologic defects to justify the use of a quad cane, and Dr. Aggarwal did not document any atrophy of any muscles in the lower extremities that would cause leg weakness.  At most, Dr. Aggarwal notes, "Rt quad and dorsiflexor strength are decreased," but this is also a note that was continued from visit to visit, starting in August 2007, as opposed to a specific finding regarding the medical necessity of a quad cane in September 2009.  (*See* R. 325, 330, 380, 383, 387, 391, 394, 398, 402, 406.)   Furthermore, the prescription slip for the quad cane only states, "LBP = leg weakness"; there is no other medical documentation establishing the need for the quad cane or describing the circumstances under which it is needed.  Dr. Akinwande, a consultative examining physician, also questioned whether the quad cane was medically necessary based on his own examination as well.  (*Id*. at 470.); *Halama v. Comm'r of Soc. Sec.*, No. 1:12-cv-1859, 2013 WL 4784966, at *8 (N.D. Ohio Sept. 5, 2013) (noting that proof of medical necessity of a cane requires an unambiguous statement of a physician containing the circumstances under which it would be medically necessary for claimant to use a cane); *cf. Ray v. Comm'r of Soc. Sec*., 940 F. Supp. 718, 728 (S.D. Ohio 2013) (recommending remand where there was medical evidence documenting need for prescribed cane which ALJ summarily disregarded and without basing such a decision on any medical opinion of record).  In short, Helm has not shown the cane is medically necessary, or even under what circumstances it would be.  *See Robinson v. Comm'r of Soc. Sec.*, No. 5:14-CV-291, 2015 WL 1119751, at *15 (N.D. Ohio Mar. 11, 2015) (finding that,

it was not error to omit use of cane in RFC because claimant had not "pointed to sufficient medical documentation establishing the need for a cane and describing the circumstances for which it is needed").  As a result, the ALJ did not err in deciding not to incorporate the use of the cane into Helm's RFC.  *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 508 (6th Cir. 2013) (unpublished opinion) ("Because the ALJ found that the evidence did not suggest that Johnson needed a cane, it was not erroneous for the ALJ to exclude this factor in determining Johnson's RFC."); *Halama*, No. 1:12-cv-1859, 2013 WL 4784966, at *8 (finding that decision of ALJ not to incorporate use of cane into RFC was supported by substantial evidence because there was no medical documentation establishing the need for same).

Furthermore, the ALJ found that Dr. Aggarwal's assessment was not consistent with numerous other medical opinions of record.  For example, even when Dr. Becherer believed that there might be possible recurrent nerve root compression, he indicated that, while Helm may not be able to resume her duties as a floor nurse, she would likely be able to find some means of gainful employment once her back condition was stabilized.  (R. 350.)   And, in fact, Dr. Becherer did later determine that Helm's back condition had been stabilized.  Additionally, examining physician Dr. Sexton opined that, from the isolated perspective of her back condition, Helm could return to work.

Finally, Dr. Aggarwal's opinion that Helm is precluded from even sedentary work is inconsistent with his prior opinion.  In March 2007, Dr. Aggarwal stated that Helm was ready to return to work, but advised that she lift no more than 20 pounds, avoid repeated bending and stooping, no twisting, and to sit/stand as tolerated.  Dr. Aggarwal reiterated those restrictions again in July 2007.  (R. 323.)  Dr. Aggarwal's October 2009 RFC assessment that Helm cannot

even perform sedentary work is completely inconsistent with the March 2007 assessment and is not supported by the medical evidence in the record, in particular the conservative treatment of Helm's lumbar condition and the 2008 CT myelogram which revealed no nerve root compression. *See Bogle v. Sec'y of Health and Human Servs.*, 998 F.2d 342, 348 (6th Cir. 1993) (finding that Commissioner was not bound by treating physician's opinion that claimant was disabled due to physician's earlier, conflicting opinions); *Villareal v. Sec'y of Health and Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987) (*per curiam*) (finding that Commissioner properly refused to credit treating physician's finding of disabled because it was not substantiated with medical data and was inconsistent with previous opinions).

It is the ALJ's job to resolve conflicts in the record evidence. *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987) (noting that ALJ must resolve conflicting evidence in the record, including opinions from treating physicians that claimant is disabled and from consulting physicians that claimant is capable of working). In doing so, the Court finds that the ALJ gave "good reasons" for giving Dr. Aggarwal's opinions little weight and that those reasons are supported by substantial evidence in the record. *Bowen v. Soc. Sec. Admin.*, 581 F. App'x 544, 545 (6th Cir. Nov. 3, 2014) (unpublished opinion) ("[The treating physician's] conclusion that Bowen had significant physical limitations conflicted with her treatment notes and the other medical evidence in the record, which generally demonstrated that Bowen's physical condition was stable and that she was not suffering from debilitating physical impairments."). Therefore, the Court declines to remand this case back to the Commissioner based on the weight given to Dr. Aggarwal's opinions. *See Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. June 11, 2014) (unpublished opinion) ("Substantial evidence supports

the administrative law judge's finding that [the treating physician's] proposed severe limitations were inconsistent with the evidence in the record and the treating physician rule was not violated.").

### ii.    Dr. Becherer

Similarly, the ALJ did not err in ignoring the restrictions imposed by Dr. Becherer in January 2008, specifically that Helm could not lift over five pounds and that she should avoid repetitive bending and twisting.  This is because, at the time Dr. Becherer rendered that opinion, the August 2007 lumbar MRI indicated recurrent disc herniation, and he believed that Helm's back condition had not stabilized.  Importantly, at the same time he imposed these restrictions, Dr. Becherer opined, "Although I am not sure her duties as a floor nurse would be reasonable, certainly within the nursing profession she would likely be able to find some means of gainful employment once her back condition was stabilized."  (R. 350; *see also id*. at 351 ["[C]ertainly with her education she should be able to find something within the nursing field that would be able to accommodate her back limitations."].)

As the Court has indicated, a June 2008 CT myelogram revealed no residual or recurrent nerve root compression, and, as a result, Dr. Becherer retracted his earlier recommendation for surgery.  Additionally, Dr. Becherer noted that there was no instability mentioned in the interpretation of the CT myelogram.  Therefore, the ALJ did not err in discounting the stale opinion rendered by Dr. Becherer regarding Helm's limitations.  *See Anthony v. Comm'r of Soc. Sec*., 266 F. App'x 451, 459 (6th Cir. Feb. 22, 2008) (unpublished opinion) (finding that ALJ gave good reasons for discounting treating physician's opinion based on medical evidence not relevant during the critical period of time); *Hamblin v. Comm'r of Soc. Sec*., 7 F. App'x 449, 451

(6th Cir. March 26, 2001) (unpublished opinion) (finding that an ALJ is not bound by opinion of treating physician based on outdated assessment).

### iii.    Dr. Lorber

Helm's only argument with respect to Dr. Lorber is as follows:  "In fact, the physician given the most weight, Dr. Lorber[,] never personally examined Helm and therefore his opinions must be given no weight."  (DN 10-1, p. 4.)  Helm's assertion is simply incorrect.  Dr. Lorber was retained as a non-examining medical expert, and the regulations permit opinions from such an expert to be weighed in accordance with the factors listed in 20 C.F.R. § 1527(c) (1)-(5) (examining relationship, area of specialty, consistency, and supportability); *see, e.g., Matelski v. Comm'r of Soc. Sec.*, 149 F.3d 1183, 1998 WL 381361, at \*5 (6th Cir. June 25, 1998) (unpublished opinion) ("[T]he regulations clearly permit an ALJ to consider the opinion of a non-examining medical expert.") (citing 20 C.F.R. § 404.1527(d)); *Hoskins v. Comm'r of Soc. Sec.*, 127 F.3d 1102, 1997 WL 659671, at \*1   (6th Cir. Oct. 22, 1997) (unpublished opinion) (rejecting claimant's argument that medical assessment performed by testifying medical expert was erroneous because that medical expert had never examined him).

Furthermore, while not raised by Helm, the Court notes that the ALJ followed the appropriate regulations in assigning Dr. Lorber's opinions great weight.  The ALJ noted and considered Dr. Lorber's specialty – orthopedics – as well as the fact he reviewed all of Helm's medical records and questioned Helm at the hearing, finding that Dr. Lorber's opinions were more consistent with the conservative treatment history, inconsistent exam findings, and objective evidence in the record.  (R. 24-25.)  Dr. Lorber supported his opinions on the record at the hearing.  (*Id*. at 31-47.)  Thus, the ALJ applied the correct legal standards in giving Dr.

Lorber's opinions great weight.  *See, e.g.*, *Tolson v. Comm'r of Soc. Sec.*, No. 11-CV-2324, 2012 WL 5877229, at *5 (N.D. Ohio Nov. 20, 2012) (finding that ALJ followed proper legal standards when giving little weight to treating physician and significant weight to state agency medical experts).  As a result, the Court declines to remand this case to the Commissioner on this basis.  *See Lewis v. Comm'r of Soc. Sec.*, No. 3:12-CV-01720, 2013 WL 5563764, at *31 (N.D. Ohio Sept. 30, 2013) ("Since the ALJ applied the correct legal standard and his conclusion is based on substantial evidence, the Magistrate finds no reason to disturb the weight given the state agency medical experts.").

### 2.      Finding No. 12

At Finding No. 12, the ALJ determined that, although Helm could not return to her past work, considering her age, education, work experience, and RFC, she has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy.  (R. 25-26, 142-44.)  The ALJ noted that Helm was 50 years old on the alleged disability onset date, which is defined as an individual closely approached advanced age, and that she subsequently changed age category to advanced age.  (*Id*. at 25.)  Therefore, the ALJ concluded that, while Helm cannot perform the full range of sedentary work, a finding of "not disabled" was appropriate using Rules 201.07 and 201.15 of the medical-vocational grid as a framework.  (*Id*. at 26.)

### a.      Helm's arguments

Helm argues that the ALJ failed to make reference to the fact that she was a person closely approaching advanced age and whose age seriously affects her ability to work.  (DN 10-1, p. 6.)  Helm contends that this failure, coupled with the fact that she could not perform the full

range of sedentary work, was reversible error.  (*Id.*)  Helm further states that she was already 50 years old on October 1, 2006, the alleged onset date, but that the ALJ incorrectly noted that the "cutoff" was age 50 when it is actually 49; Helm argues that had the ALJ incorporated this fact into his decision a finding of disabled would be required.  (*Id.*)

### b.    Applicable law

At the fifth step of the sequential evaluation, the burden is on the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform given his or her RFC, age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v), (g); 20 C.F.R. § 1562(c); *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 684 (6th Cir. 1992).  The Commissioner may carry this burden by applying the medical-vocational grid located at 20 C.F.R. 404, Subpart P, Appendix 2.  The medical-vocational grid directs a conclusion of "disabled" or "not disabled."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004).  When a claimant's RFC, age, education, and past work experience coincide with all of the criteria of a particular grid rule, the Commissioner may rely on that grid rule to meet this burden.  20 C.F.R. § 404.1569; *Born v. Sec'y of Health and Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990).  If a claimant's RFC, age, education, and past work experience do not coincide with all the criteria of a particular grid rule, the Commissioner is limited to using the medical-vocational grid as a framework and must rely on the testimony of a vocational expert.  20 C.F.R. § 404.1569; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004) ("In such a case, the Commissioner may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy.").

#### c.      Analysis

At the time of the alleged onset date, October 1, 2006, Helm was 50 years old.  This is defined as an "[i]ndividual[] approaching advanced age (age 50-54)."  20 C.F.R. § 404, Subpart P, Appendix 2, Rule 201(g).  At the time the ALJ rendered his decision, Helm was 56 years old, which is defined as "advanced age (55 and over)."  *Id*. at Rule 201(f).  The ALJ correctly noted that Helm was 50 years old on the alleged onset date and therefore closely approaching advanced age; the ALJ also correctly noted that Helm subsequently changed to the advanced age category. Helm appears to argue that the ALJ incorrectly stated at the May 2012 hearing that the "cutoff" age for a person categorized as a "younger person" – that is, a person who is under the age of 50 (*i.e.*, aged 18-49) –  is 50, not 49.  *See* 20 C.F.R. § 404.1563(d).  Whether the ALJ incorrectly stated the "cutoff" age for a person categorized as a "younger person" is of no moment in this instance.  This is because the ALJ did not categorize Helm as a "younger person"; rather, the ALJ analyzed Helm's claims as both an individual approaching advanced age and a person with advanced age.  Therefore, Helm's argument in this regard does not hold water, and the Court will turn to whether the ALJ properly considered Helm's advanced age in determining that she is not disabled.

The ALJ found – and Helm does not contest – that she has at least a high school education, is able to communicate in English, and has acquired transferrable work skills from her past relevant work as a nurse.  Helm's age at the time of the ALJ's decision (56) governs the application of the regulations.  *See Varley v. Sec'y of Health & Human Servs*., 820 F.2d 777, 780 (6th Cir. 1987) ("[T]he claimant's age as of the time of the decision governs in applying the regulations.").  If Helm were able to perform the full range of sedentary work, Rule 201.07 of the

27

medical-vocational grid (advanced age with high school education or more which does not provide for direct entry into skilled work, but has transferable skills) would mandate a finding of not disabled.  Here, however, as the ALJ noted, Helm could not perform the full range of sedentary work; therefore, the medical vocational grid is used as a framework, but does not automatically mandate a finding of not disabled.  "In such a case, the Commissioner may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy."  *Wilson*, 378 F.3d at 548.

As the regulations note, while advancing age is an increasingly limiting factor in the ability to find work, the Commissioner "will not consider your ability to adjust to other work on the basis of your age alone."  20 C.F.R. § 404.1563(a).  20 C.F.R. § 1568(d)(4) addresses transferability of skills for persons of advanced age.  If a claimant is of advanced age (55 or older) and has severe impairments that limit her to sedentary or light work, the Commissioner will find that the claimant cannot make an adjustment to other work *unless* the claimant has skills that she can transfer to other skilled or semi-skilled work that can be performed despite any limitations prescribed.  *Id.*  If a claimant is limited to no more than sedentary work, the Commissioner will find that the claimant has skills that are transferable to other skilled or semi-skilled sedentary work *only if* the sedentary work is so similar to previous work that the claimant would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.  *Id.*

The ALJ addressed properly addressed these factors in his decision.  First, the ALJ elicited testimony from the vocational expert regarding the skills acquired by Helm from her past relevant work as a nurse – specifically medical care and knowledge, record keeping, report

writing, planning and organization, and computer use – that are transferable to other skilled work in a sedentary capacity; Helm does not contest this finding.  (R. 25, 50, 141-44.)  Furthermore, the sedentary nursing work available to Helm is so similar to her past relevant work that it would require very little vocational adjustment.   As the vocational expert testified, the jobs available to Helm would be with "[i]nsurance companies [that] utilize registered nurses to do case management services."  (*Id*. at 52, 144.)

And, while not raised by Helm, the Court can find no fault with the ALJ's determination that there are jobs existing in significant numbers in the national economy that Helm can perform with her limitations.  The vocational expert considered the limitations imposed by Dr. Lorber and then identified 154,000 national and 2,400 statewide sedentary nursing jobs that would be available to her.  (*Id*. at 51-52, 142.)  When the ALJ must make a non-guideline determination, he "may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy." *Wilson*, 378 F.3d at 548; *Bradford v. Sec'y of of Health and Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986) (noting that a vocational expert's testimony can constitute substantial evidence to support the Commissioner's finding that a claimant is capable of performing a significant number of jobs existing in the local, regional, and national economies).  Consequently, the Court finds the ALJ's determination that a significant number of jobs exist in the national economy is supported by substantial evidence. *See, e.g.*, *Hall v. Sec'y of Health and Human Servs*., 837 F.2d 272, 275 (6th Cir. 1988) (concluding that ALJ's finding that 1,350 jobs in region constituted significant number was supported by substantial evidence); *Nejat v. Comm'r of Soc. Sec*., 359 F.

App'x 574, 579 (6th Cir. Dec. 22, 2009) (unpublished opinion) (finding that 2,000 jobs constituted significant number).

In sum, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Comm'r of Soc. Sec.*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Sec'y of Health and Human Servs.*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389–90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is because there is a "'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton*, 246 F.3d at 773 (quoting, in part, *Mullen,* 800 F.2d at 545). Therefore, the question to answer is not whether substantial evidence contradicts the ALJ's finding; rather, it is whether the finding is supported by substantial evidence, and it is here. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("While [it may be true that substantial evidence contradicts the Secretary's findings], it is also true that substantial evidence supports the Secretary's finding."). Consequently, the Court finds that the final decision of the Commissioner should be affirmed.

## III.   CONCLUSION

For the foregoing reasons, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

(1) The final decision of the Commissioner of Social Security is **AFFIRMED** and this action is **DISMISSED** with prejudice.

(2)   A final judgment will be entered separately.

cc:  Counsel of record